Herbert C. Camien v. Commissioner. Herbert C. Camien and Melita B. Howard, formerly Melita B. Camien, v. Commissioner.
Camien v. Commissioner
Docket Nos. 1746-65 and 1747-65.
United States Tax Court
T.C. Memo 1968-12; 1968 Tax Ct. Memo LEXIS 285; 27 T.C.M. (CCH) 51; T.C.M. (RIA) 68012; January 19, 1968. Filed William J. Becker, 7730 Forsyth Blvd., St. Louis, Mo., for the petitioners. James H. Martin and Leonard A. Hammes, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in income tax and additions to tax of petitioner Herbert C. Camien for the taxable year 1951 in the following amounts: Additions to Tax
Deficiency in
Sec. 293(b)
Sec. 291(a)
Sec. 294(d)(1)(A)
Income Tax
I.R.C. 1939
I.R.C. 1939
I.R.C. 1939
$4,107.36
$2,053.68
$999.07
$356.18
Respondent also determined deficiencies in income taxes and additions to taxes of petitioners Herbert C. Camien and Melita B. Howard (formerly Melita B. Camien) for the taxable years 1952, 1953, 1954, *286 and 1955 in the following amounts: Additions to Taxes
Deficiencies In
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 6653(b)
Year
Income Taxes
I.R.C. 1939
I.R.C. 1939
I.R.C. 1954
1952
$11,328.47
$ 5,664.24
$1,150.85
1953
34,916.22
17,458.11
3,142.15
1954
2,766.74
248.98
$1,383.37
1955
8,262.78
4,131.39
The issues for decision are: (1) Whether the assessment and collection of any deficiency in income tax against petitioners for the years 1951 and 1953 through 1955 are barred by the statute of limitations. This issue requires a determination of whether a return was filed by petitioner Herbert C. Camien for the year 1951 and whether a part of the deficiency or underpayment of tax for each of the years 1951, 1953, 1954, and 1955 is due to fraud with intent to evade tax. (2) Whether petitioner Herbert C. Camien received income in 1951 in the amount of $11,000 from Denton Sand and Gravel Company in the form of two notes totaling the amount of $11,000 signed by the president of the Denton Sand and Gravel Company and whether petitioner Herbert C. Camien had income in the year 1951 as commissions 52 from the Denton Sand and Gravel *287 Company and Pacific Sand and Gravel Company, Inc., in the amount of $2,144.56. (3) Whether respondent's computation of petitioner's gross income for the taxable years 1952, 1953, 1954, and 1955 by the net worth plus expenditures method is proper and if so the proper amount so computed. (4) Whether all or part of the deficiencies, if any, in petitioners' income taxes for the calendar years 1951, 1952, and 1953, and all or part of the underpayments of income taxes, if any, by petitioners for the years 1954 and 1955 are due to fraud with intent to evade taxes. (5) Whether respondent properly determined an addition to tax for petitioner Herbert C. Camien for failure to file an income tax return for the taxable year 1951 and additions to taxes for petitioner Herbert C. Camien for the taxable year 1951 and both petitioners for the taxable years 1952, 1953, and 1954 for failure to file declarations of estimated tax. (6) Whether both petitioners Herbert C. Camien and Melita B. Howard are estopped from denying that their income tax returns for the taxable years 1953 and 1955 were false and fraudulent by reason of Herbert C. Camien's conviction for those years of criminal charges of *288 willfully and knowingly attempting to evade and defeat income taxes by fraudulently filing joint income tax returns on behalf of himself and his wife. Findings of Fact General Facts Some of the facts have been stipulated and are found accordingly. Petitioners Herbert C. Camien (hereinafter referred to as Herbert) and Melita B. Howard, formerly Melita B. Camien (hereinafter referred to as Melita), were during the taxable years 1952 through 1955 husband and wife who resided in Clayton, Missouri until about September 12, 1955. From September 12, 1955 throughout the balance of the year 1955, they resided in St. Louis County, Missouri. Herbert during the entire year 1951 resided in Clayton, Missouri. For the calendar years 1952, 1953, 1954, and 1955 Herbert and Melita filed joint Federal income tax returns with the office of the director or district director of internal revenue at St. Louis, Missouri. Herbert and Melita were married in 1943. Both Herbert and Melita had previously been married. Herbert has a son and a daughter from his prior marriage, Donald R. Camien and Patricia Jeanne Camien Shannon. Melita has a son, Donald L. Howard, by her prior marriage. Facts as to *289 the Year 1951 In 1947 Herbert became associated with Charles Tarantola (hereinafter referred to as Tarantola) with the understanding that Herbert would render certain financial assistance to Tarantola in connection with certain businesses owned in whole or in part by Tarantola. At that time Tarantola was president of and a stockholder in Denton Sand & Gravel Company and also owned a 50 percent interest in Construction Equipment Company. During the years 1947 to 1951 Herbert rendered services at the request of Tarantola for both Denton Sand & Gravel Company and Construction Equipment Company and for Tarantola in connection with his various enterprises. At the time Herbert became associated with Tarantola, Denton Sand & Gravel Company was in bad financial condition. Tarantola personally held a chattel mortgage on the corporation's equipment which he foreclosed sometime prior to the beginning of 1951. At about the time Tarantola foreclosed his chattel mortgage on the equipment of Denton Sand & Gravel Company, Tarantola prepared a note of that company in the amount of $30,000 payable to Herbert, which note was for compensation not paid to Herbert in cash for services rendered to the *290 company and to other business interests of Tarantola during the years 1947 through 1950. Herbert did not report any amount with respect to the $30,000 note on any of his income tax returns for the years 1947 through 1950. Tarantola and certain of his business enterprises were represented by an attorney by the name of Arthur U. Simmons (hereinafter referred to as Simmons). Herbert for sometime prior to 1947, throughout the years 1947 to 1952, and until the time of the death of Simmons in March of 1953, also had various associations and business connections with Simmons. The $30,000 note of Denton Sand & Gravel Company had been turned over to Simmons to hold and was in his possession in 1951. Herbert and Tarantola were having certain differences and Simmons arranged a conference between the two in his office. At this conference Simmons stated that Tarantola and his wife were willing to sign a personal note in the total amount of $11,000 payable 53 to Herbert in settlement of the $30,000 note of Denton Sand & Gravel Company with the understanding that Herbert would work with Tarantola toward getting Denton Sand & Gravel Company operating again. On October 18, 1951, Tarantola and *291 his wife executed two promissory notes totaling $11,000 to Herbert which were to be in replacement of the $30,000 note. The two notes totaling $11,000 were signed in Simmons' office and were held by Simmons who represented both Herbert and Tarantola. Pacific Sand and Gravel Inc. (hereinafter referred to as Pacific), was a corporation organized under the laws of Missouri on April 6, 1951. This corporation was issued an authority to commence business on May 29, 1951. Upon incorporation, Pacific had 500 shares of capital stock issued and outstanding, 200 shares of which were issued to Herbert, 250 shares were issued to Simmons, and 50 shares were issued in the name of Ludwig Mayer. On October 17, 1952, the stock certificate representing the 250 shares in the name of Simmons was cancelled and another for 250 shares was issued on the same day to Melita. Also, on October 17, 1952, the stock certificate representing the 50 shares in the name of Ludwig Mayer was cancelled and another certificate for 50 shares was issued to Herbert's son, Donald R. Camien. During 1951 Pacific began operating with the equipment which had belonged to and been used by Denton Sand & Gravel Company prior to *292 Tarantola's taking it over by foreclosure. Pacific and Tarantola had an agreement in the form of a lease-purchase respecting the use by Pacific of the equipment and this agreement provided among other things that Tarantola would manage the operations of Pacific until a certain total amount had been paid to him by Pacific under the lease-purchase agreement. Throughout the year 1951 Pacific was under the management of Tarantola. Herbert received checks from Denton Sand & Gravel Company on January 16, 1951, January 26, 1951, February 7, 1951, and March 9, 1951, in the amounts of $50, $100, $200, and $94.56, respectively. These amounts were charged on the books of Denton Sand & Gravel Company as commissions to Herbert. In some later year Herbert entered these payments on the back of a note of Construction Equipment Company signed by Tarantola and Joseph Strebler dated October 30, 1948, payable on demand and if no demand be made then on December 31, 1948, as payments on this note. Tarantola owned 50 percent of the stock of Construction Equipment Company, and until sometime after October 30, 1948, Joseph Strebler owned the other 50 percent of the stock of this corporation. Sometime in *293 the early part of 1949 Strebler was paid $1,000 and had certain machinery released to him and was given a release by Construction Equipment Company from indebtedness owed by that company. He assigned all his interest in the company to Tarantola. In 1948 Construction Equipment Company was in bad financial condition. All of its equipment was mortgaged by chattel mortgages to various banks and some of the equipment had been mortgaged to three separate banks. Herbert worked with various banks in straightening out the affairs of Construction Equipment Company and arranging to liquidate the indebtedness of that company to the various banks. On August 24, 1951, Herbert received a check in the amount of $200 from Pacific and on October 17, 1951, received a check in the amount of $1,500.00 from Pacific both of which amounts in a later year he likewise credited on the October 30, 1948, Construction Equipment Company note by entering the amount on the back of the note. These checks were listed in the cash disbursement register of Pacific as cash disbursements for brokerage fees and commissions. Herbert's income tax return filed for the years 1948, 1949, and 1950 showed no income tax due, *294 but subsequently deficiencies in the amounts of $248 and $330 were assessed against Herbert for the years 1949 and 1950, respectively. On his Federal income tax return for the year 1952 Herbert made the following statement with respect to the note for $30,000 signed by Tarantola as president of Denton Sand and Gravel Company and the two notes totaling $11,000 signed by Tarantola and his wife on October 18, 1951: In 1950 received note for services from Denton Sand and Gravel Co. (3 year service) for $30,000.00 bearing no interest Company was in failing condition. Sole note to C. A. Tarantola and Rose A Tarantola, his wife, for $11,000.00 in 1951 - Note of Charles & Rose Tarantola Got cash for note 1952 Income 1952… $11,000.00 The records of the office of the district director of internal revenue at St. Louis, Missouri disclosed no record of an estimated tax return filed by Herbert for 1951 and no record of either a form 1040 or 1040-A Federal income tax return filed by Herbert for 1951. 54 During the year 1951 Herbert received salaries in the total amount of $1,875 from Denton Sand & Gravel Company and Pacific from which income tax was withheld in the amount of $111.10. *295 At the time of the trial Herbert had no retained copy of an income tax return for the calendar year 1951. Respondent in his notice of deficiency to Herbert for the calendar year 1951 determined that Herbert received salary income of $1,875, an item which is not contested by Herbert; that he received certain dividends and certain long-term capital gain which has been conceded to be an error by respondent; and in addition determined that Herbert received commissions of $2,144.56 and other income of $11,000 which he explained as follows: It is determined that during the year 1951 you received commissions of $444.56 from Denton Sand & Gravel Company, and commissions of $1,700.00 from Pacific Sand & Gravel, Inc., or a total of $2,144.56, which you failed to report for taxation. It is determined that you received other income of $11,000.00 in 1951 from Denton Sand & Gravel Company, which you failed to report for taxation. Respondent also determined an addition to tax under section 291(a), I.R.C 1939 with the explanation that "your income tax return for the taxable year ended December 31, 1951, was not filed within the time prescribed by law," an addition to tax under section 293(b), *296 I.R.C. 1939, stating that "all or part of the deficiency for the taxable year ended December 31, 1951, is due to fraud with intent to evade tax," and an addition to tax under section 294(d)(1)(A), I.R.C. 1939, with the explanation that "you failed to file a timely declaration of estimated tax for the taxable year ended December 31, 1951." Ultimate Facts as to the Taxable Year 1951 1. Petitioner Herbert C. Camien failed to file a Federal income tax return for the calendar year 1951. 2. Respondent has failed to show that any part of the deficiency in the income tax of petitioner Herbert C. Camien for the taxable year 1951 is due to fraud with intent to evade tax. The note for $30,000 for services rendered to Denton Sand & Gravel Company and other business interests of Tarantola prior to the year 1951 was not given to Herbert in payment for the services he rendered but as evidence of an indebtedness of Denton Sand & Gravel Company or Tarantola to Herbert for services. The $11,000 note of Tarantola and his wife to Herbert substituted in 1951 for the $30,000 note was not a payment to Herbert but likewise only evidence of their indebtedness to Herbert. No income resulted to Herbert *297 in the year 1951 when the two notes of Tarantola and his wife totaling $11,000 to replace the $30,000 note of Denton Sand & Gravel Company were drawn to Herbert's order and turned over to Simmons, nor did any loss result to Herbert from this transaction. 3. The payments totaling $2,144.56 received by petitioner from Denton Sand & Gravel Company and Pacific Sand and Gravel, Inc., in 1951 represented income to Herbert in that year. Facts as to the Years 1952 through 1955 Respondent examined the income tax returns filed by Herbert for the taxable years 1929 through 1931 and 1935 through 1937 and determined that deficiencies and additions to tax were due from Herbert for those years in the total amount of $7,182.57 exclusive of interest. Herbert filed an offer to compromise these taxes for the amount of $800 on the basis of inability to pay which was sworn and subscribed to before a notary public on June 10, 1947. As a part of the offer in compromise, Herbert filed a statement of assets and liabilities as of January 27, 1947, which was also under oath. This statement of assets contained the specific statement that Herbert had no assets, either actual or contingent, other than those *298 listed in the statement. The only assets which Herbert listed as owning as of January 27, 1947, were a contingent fund of $1,400 to $1,600 due from Crown Can Company, Philadelphia, Pennsylvania, and a life insurance policy of $5,000 with Northwestern Mutual Life Insurance Company with no present cash surrender value and a loan of about $1,800. Under the space on the form in which to list liabilities there appeared a note stating, "all accounts I owe are outlawed by statute," and a further note, "all Judgments outlawed except Federal Income Tax Judgments." In connection with this offer in compromise, Herbert filed an affidavit sworn to before a notary public on June 12, 1947, in which he stated that the $800 submitted in the offer in compromise of his income taxes for the years 1929, 1930, 1931, 1935, 1936, and 1937 was borrowed. 55 Herbert filed no Federal income tax return for the year 1947 and as heretofore stated, the income tax returns filed by him for 1948, 1949, and 1950 showed no tax due. In addition to the deficiencies for 1949 of $248 and for 1950 of $330, there were assessed against and paid by Herbert for these years interest to January 1, 1954, and additions to *299 tax in the amounts of $56.98 and $163.68 for the year 1949 and in the amounts of $56.02 and $217.80 for the year 1950. On his return as filed for the year 1949 Herbert showed total receipts of $3,384.78, net profit of $2,449.78, and claimed four personal exemptions. On his return for the year 1950 Herbert showed total receipts of $3,399.42. He claimed deductions of $1,458 for interest, taxes, and medical expenses, leaving net income of $1,941.42, and claimed four personal exemptions. For the year 1952 Herbert and Melita, on the joint Federal income tax return filed by them, reported total income in the amount of $11,609.52, claimed deductions for contributions, interest, taxes, and medical expenses totaling $1,645.49, leaving net income of $9,964.03. They claimed four personal exemptions and showed a tax due of $1,764.74 plus $6.75 self-employment tax. The adjusted gross income reported on the joint income tax return of Herbert and Melita for the year 1952 consisted of $3,300 in wages received from Pacific, dividend income from stocks owned by Melita of $359.82 and $11,000 which was the amount reported by Herbert in 1952 with respect to the two notes from Tarantola and his wife totaling *300 $11,000. He reported this $11,000 as business income and subtracted therefrom $3,050 explained as follows: Purchased lot from Harry J. Shaller in 1928, but never filed deed. Mr. Shaller died, and his estate claimed lot. Law suit followed, which I lost, in 1952. I have cancelled checks in my possession… $ 2,800.00 For Payment
$11,000.00
Lawyer's fee
$ 250.00
3,050.00
Loss
$ 3,050.00
Net
$ 7,950.00
Net profit
$ 7,950.00
For the calendar year 1953 Herbert and Melita on their Joint Federal income tax return reported total income of $2,361.54, claimed deductions for contributions and interest in the amount of $860, leaving a net income of $1,501.54, and claimed three personal exemptions. The return showed no tax was due. The reported income consisted of $761.54 of dividends and $1,600 as "salary or Draw Treas. Shirley Corp." For the calendar year 1954, Herbert and Melita on their joint Federal income tax return showed adjusted gross income of $2,240.38 and tax of $43 from which was subtracted a claimed retirement credit of $50 leaving no tax payment due. The income as reported was composed of interest from Shirley Corp. of $2,150 less interest *301 paid to Mercantile Commonwealth Bank and 7701 Shirley Corp. totaling $1,260 leaving a net interest received from 7701 Shirley Corp. of $890, income from dividends of $712.75, and additional profit on sale of Affiliated Fund of $637.63. On their joint return for 1954 Herbert and Melita claimed three personal exemptions. Herbert and Melita on their joint Federal income tax return for the calendar year 1955 reported adjusted gross income of $2,594.99 and showed no tax due. The income as reported consisted of dividend income of $469.04, interest from Shirley Corp. of $2,075.49, and interest from County National Bank of $50.46, making total interest of $2,125.95. During the years 1952 through 1955 Herbert represented Otto Wilke (hereinafter referred to as Otto) and his wife in income tax matters pending before the Internal Revenue Service. In the late spring or early summer of 1952 Herbert met with the internal revenue agent examining Otto's income tax return and discussed with the revenue agent the obtaining of information as to the value of Otto's assets which the agent had requested from Otto in connection with preparing a net worth statement. Herbert met with the internal revenue *302 agent on several other occasions during 1952 and into the spring of 1953, representing Otto in connection with Otto's income tax matters. On one occasion in 1953 Herbert went to a conference with the revenue agent working on Otto's tax liabilities and the revenue agent's supervisor. For the purpose of ascertaining the cash which Otto had on hand at the beginning of the net worth period, Herbert handed to the revenue agent a document purporting to have been made in 1929 which was actually made at a much later date. Except for the cash on hand in support of which the document purported to have been made in 1929 was offered, a final settlement of Otto's tax liability was made with another accountant and an attorney representing Otto on the basis of figures substantially the same as those submitted by Herbert to the revenue agent as being a statement of Otto's net worth. During the years 1952, 1953, 1954, 56 and 1955 Herbert received $2,500 $150, $3,250, and $6,000, respectively, for services rendered in connection with Otto's income tax liabilities. He had some expenses in connection with the services he rendered to Otto for which he was not separately reimbursed. Of the amount paid *303 to Herbert by Otto or Oliver Wilke (Otto's son) in 1955, $5,000 was paid in cash on October 27, 1955. Herbert was employed by Otto at the suggestion of Simmons who represented Otto as an attorney up until the time of his death in 1953. Simmons had suggested to Otto that he employ Herbert to make certain investigations for him and Herbert did make the investigations. Herbert made one investigation in connection with Otto's tax liability in Illinois and turned some moneys in connection with the investigation over to the Burns Detective Agency. Otto was refunded $63 by Burns Detective Agency. Herbert also made out some income tax returns for Otto. On November 7, 1951, Pacific obtained leases to mine sand and gravel for certain real estate located on the Meramec River near Pacific, Missouri. Arrangements for these leases were made by Herbert and the leases were executed on behalf of Pacific by Tarantola as general manager. Denton Sand & Gravel Company had been mining in the same general area where these leases were located but had mined all of the gravel from the areas on which they had leases. The leases which Pacific obtained on November 7, 1951, provided for no advance royalty, bonus, *304 or other consideration to be paid to the landowners and lessors for the execution of such leases or for the execution of subsequent amendments or extensions thereof other than royalties of 3 cents per ton of sand and gravel mined, removed, and sold from the property by Pacific. Herbert made no payment to the landowners to obtain these leases. Herbert made no payment for his capital stock in Pacific other than obtaining for Pacific the leases in which he had no basis. Herbert told revenue agents that he made certain payments to a man named Ewing for boring charts for Pacific and that he purchased certain specific equipment with designated serial numbers, which equipment was turned over to Pacific. No such person as Ewing, in fact, existed and the equipment with the serial numbers which Herbert said he purchased was in fact sold to other persons by the manufacturers thereof and was in use by those persons at the date Herbert stated he purchased it and turned it over to Pacific. The lease of equipment by Pacific from Tarantola provided for a total payment of $426,000 payable in four yearly installments of $106,250 and an additional $1,000 within 2 months from the termination of the *305 lease for the purchase of the equipment covered by the lease. The agreement was effective as of July 1, 1951. Most of the equipment under the purchase-lease agreement between Pacific and Tarantola was equipment which had been owned by Denton Sand and Gravel Company. Herbert had purchased certain materials and supplies from Clyde Denton for a total amount of $25,000, of which $17,500 was for materials and $7,500 was for supplies. On Pacific's opening journal entries as of July 1, 1951, there appears the following entry: Debit
Credit
Mining lease
$50,000.00
Capital stock
$50,000.00 Also on the journal entries of Pacific on July 1, 1951, the following items appeared: Debit
Credit
Materials
$17,500.00
Supplies
7,500.00
H.C. Camien
$25,000.00 The amount of this $25,000 was carried forward to an account on Pacific's books in the name of Herbert and appears as the first credit entry in that account for the fiscal year 1953 under the date July 1, 1952. On October 31, 1952, the agreement between Pacific and Tarantola for the installment purchase lease by Pacific of mining equipment was modified to provide for semi-annual payments *306 of $53,125 instead of annual payments of $106,250. The original agreement between Pacific and Tarantola provided that * * * for further security and protection of the covenants and conditions herein, Charles A. Tarantola is hereby appointed Manager of said Pacific Sand & Gravel, Inc., during the terms of this agreement at a salary of not more than Two Hundred ($200) Dollars per week. It is further understood that after the payment of two yearly rentals to Charles A. Tarantola and Rose A. Tarantola (either or survivor) their heirs or assigns, Pacific Sand & Gravel, Inc., may at its election dispense with the services of Charles A. Tarantola. It was further provided that Should however, Pacific Sand & Gravel, Inc., deposit money in escrow for the 57 balance of money then due as rental, then in that event said Pacific Sand & Gravel, Inc., may dispense, at its election, with the services of the said Charles A. Tarantola. On October 31, 1952, Pacific was contemplating the sale of its mining leases and the assignment of its agreement with Tarantola to Pacific Pebbles Company, an unrelated corporation. Such an agreement was executed between Pacific and Pacific Pebbles Company *307 on November 3, 1952. The "Modification of Tarantola Lease" entered into between Pacific and Tarantola on October 31, 1952, also referred to Pacific Pebbles, Inc., as "Party of the Third Part" and stated that Pacific Pebbles, Inc., would be referred to in the agreement as the "Corporation." This agreement provided in part as follows: WHEREAS, in order to assure to the Corporation peaceable possession under its lease from Pacific, the Corporation has requested from the Tarantolas and Pacific clarification and modification of the Tarantola Lease and the warranties and assurances hereinafter provided; NOW, THEREFORE, in consideration of the premises, it is hereby agreed and understood by and between the parties hereto: 1. The Tarantolas and Pacific do each warrant to the Corporation and its assigns that the Tarantolas are vested with good marketable title to the gravel mining equipment described and inventoried in the Tarantola Lease, free and clear of all liens and encumbrances, excepting only the said Tarantola Lease. 2. The duration of the Tarantola Lease is for the period commencing July 1, 1951 and ending June 30, 1955. 3. The Tarantolas and Pacific warrant to the Corporation *308 and its assigns that the Tarantola Lease is in full force and effect and that there are no delinquencies with respect thereto. 4. The Tarantolas acknowledge that they have been paid, by note or otherwise, the full amount of the rental due under the Tarantola Lease for the period from the commencement of the said lease until December 31, 1952, and the Tarantolas do further waive all claims against the Corporation or its assigns arising from the non-payment of any rentals due or to become due to them from Pacific under the Tarantola Lease up to and including December 31, 1952, and the Tarantolas waive any and all rights which they may have against the Corporation or its assigns or against the property included in the said Tarantola Lease on account of, arising from, or growing out of any transactions between the Tarantolas, or either of them, on the one hand, and Pacific on the other hand. 5. Pacific directs the Corporation and its assigns to pay to the Tarantolas in full payment and satisfaction of the rentals payable to Pacific under its lease to the Corporation of the gravel mining equipment for the period commencing January 1, 1953 and ending June 30, 1955, and the Tarantolas *309 agree to accept such payments in full discharge of the rentals payable by Pacific under the Tarantola Lease as follows: $53,125.00 on January 1, 1953, as rental for the period of January 1, 1953 to June 30, 1953; $53,125.00 on July 1, 1953, as rental for the period of July 1, 1953 to December 31, 1953; $53,125.00 on January 1, 1954, as rental for the period of January 1, 1954 to June 30, 1954; $53,125.00 on July 1, 1954, as rental for the period of July 1, 1954 to December 31, 1954; $53,125.00 on January 1, 1955, as rental for the period of January 1, 1955 to June 30, 1955. On November 3, 1952, Pacific by Herbert, its president, had given a note of $34,280.81 payable January 1, 1953, to Tarantola and had put up as security 500 shares of Pacific stock. Also, in order to obtain the release of Tarantola from the provision that he be the manager of Pacific before 2 full years' rental was paid, Pacific had agreed to place in escrow with the St. Johns Community Bank the $53,125 payment due to Tarantola on January 1, 1953. Upon completion of the sale by Pacific of the leases and the assignment of the equipment sale lease agreement, Pacific Pebbles Company paid to Pacific by *310 secretary's checks of the United Bank and Trust Company made payable to Mineral Properties, Inc., and endorsed by Mineral Properties, Inc., to Pacific the following amounts: One $50,000 check, one $25,000 check, and one $8,854.14 check. Pacific endorsed each of these three checks to St. Johns Community Bank, Escrow Agent. The escrow agreement between Pacific and St. Johns Community Bank was evidenced by a letter addressed to St. Johns Community Bank, Escrow Agent, signed by Pacific by Herbert as president, and acknowledged by an officer of the bank, the letter being dated November 3, 1952. This letter stated in part: 58 It is our understanding that you have deposited, for delivery to us, one Collateral note, in the amount of $34,280.81, secured by the following Collateral: 250 Shares of Capital stock of Pacific Sand & Gravel, Inc. endorsed in the name of M. B. Camien 200 Shares of Capital stock of Pacific Sand & Gravel, Inc. endorsed in the name of Herbert Camien 50 Shares of Capital stock of Pacific Sand & Gravel, Inc. endorsed in the name of Donald R. Camien Also, modification of the Tarantola lease, signed and acknowledged by Charles A. Tarantola and Rose A. Tarantola *311 and Pacific Sand & Gravel, Inc. Also, release by Charles A. Tarantola, signed and acknowledged by Charles A. Tarantola These documents are to be delivered to Pacific Sand & Gravel, Inc., their representative or assigned, upon the deposit with your bank, in escrow, of the amount of $87,405.81, which represents payment of the $34,280.81 note and the $53,125.00 represents an unconditional guarantee of the payment due Charles A. Tarantola and Rose A. Tarantola on the lease agreement to be paid to them on January 1, 1953. Your bank, upon payment of you to them, is to receive from Charles A. Tarantola and Rose A. Tarantola a receipt of payment in satisfaction as rental for the period of January 1, 1953 to June 30, 1953, as specified in the lease agreement of November 7, 1951, by and between Pacific Sand & Gravel, Inc. and Charles A. Tarantola and Rose A. Tarantola. The check for $8,854.14 represented one month's payment under the lease-purchase agreement between Pacific and Tarantola for the equipment covered by that leasepurchase agreement. On November 5, 1952, the St. Johns Community Bank issued to Pacific two cashier's checks, one in the amount of $34,280.81 and the other in the *312 amount of $53,125. Each of these cashier's checks was endorsed by Pacific by Herbert, and by Tarantola. Under date of January 2, 1953, Tarantola and his wife signed a document entitled, "Receipt" which recited that there had been received of Pacific the sum of $53,125 as payment in full for rent due for the period January 1, 1953 to June 30, 1953, pursuant to the provisions of the agreement dated October 31, 1952, modifying the agreement dated November 15, 1951. At a special meeting of the shareholders of Pacific on December 12, 1952, a reduction in the capital stock of Pacific from $500,000 to $50,000 was authorized, and a reduction from $50,000 paid-in capital to $25,000 paid-in capital was also authorized. At the time of this meeting the shareholders and officers of Pacific consisted of Herbert, Melita, and Donald R. Camien. On January 6, 1953, Pacific Pebbles Company had issued a secretary's check on the United Bank and Trust Company in the amount of $53,125 to Pacific Sand & Gravel Company, which amount was in payment of the rental of the equipment under the lease-purchase agreement assigned to it by Pacific for the period January 1, 1953 through June 30, 1953. On January 6, 1953, Herbert *313 as president of Pacific drew a check in the amount of $53,125 on the corporate bank account of Pacific, and with this check he purchased three cashier's checks, one in the amount of $25,000 payable to H. C. Camien Trustee for Patricia Camien and Donald Camien, another in the amount of $25,000 payable to Melita, and a third in the amount of $3,125 payable to Herbert. The cashier's check payable to Herbert as trustee was endorsed over by him to Patricia Jeanne Camien Shannon. By entry on its books dated January 6, 1953, the capital stock account of Pacific was reduced by $25,000. On October 14, 1938, Mary E. Rupert, the mother of Herbert's then wife, created a trust for the benefit of her grandchildren, Donald R. Camien and Patricia Jeanne Camien, naming Herbert as trustee. The property which Mary E. Rupert transferred to the trust consisted of the real estate at 505 Polo Drive, Clayton, St. Louis County, Missouri; all of the common stock owned by Mary E. Rupert in the Whitehouse Canneries Company, Inc., an Illinois corporation; five United States Treasury Certificates in the sum of $1,000 each; and a claim against the Crown Can Company, a corporation, for commissions claimed by *314 Herbert to be due him, which claim Herbert had previously assigned to Mary E. Rupert and which was stated in the trust to have a value of $20,000. The trust agreement gave broad powers of management to the trustee including the power to sell any part of the trust property and to reinvest the proceeds in such property as the trustee might select whether or not such properties were of the type approved for trust investment. The trust provided that the trustee should use and apply as much of the net income and principal of the trust as he 59 deemed necessary for the education, maintenance, and support of the beneficiaries until each beneficiary attained the age of 25 years and that after each beneficiary became 25, the net income of that beneficiary's share should be paid to the beneficiary until the beneficiary became 30, at which time the beneficiary would receive one-half of the trust estate free from trust, and when each beneficiary became 35, the beneficiary was to receive the other onehalf of the property constituting that beneficiary's respective share of the trust. The trustee was specifically authorized to encroach upon the principal of the trust estate for the proper maintenance *315 and support of the beneficiaries if it became necessary, or to provide against any emergency which might arise affecting them because of sickness, accident, ill health, or some other misfortune. Herbert maintained no formal books and records for the trust. On October 6, 1942, a decree was entered in the Circuit Court for Sangamon County, Illinois dissolving Whitehouse Canneries Company, Inc., and on November 20, 1942, an involuntary petition was filed against the corporation by certain creditors in the United States District Court for the Southern District of Illinois, Northern Division, and on January 26, 1943, an order was entered by that Court adjudicating Whitehouse Canneries Company, Inc, a bankrupt, and on September 23, 1943, an order allowing account and discharging trustee was entered by the referee in bankruptcy in the District Court reciting that all the property of the bankrupt had been reduced to cash and distributed. On March 20, 1953, Melita purchased a four-unit apartment building located at 7701 Shirley Drive in Clayton, Missouri for a purchase price of $37,500. In connection with this purchase Melita borrowed $22,500 from the Mercantile Trust Company of the City *316 of St. Louis and the loan was secured by a mortgage covering the apartment building. As of December 31, 1953, there was outstanding on the loan $21,750, which amount was paid off during the year 1954. On March 25, 1953, a corporation known as the 7701 Shirley Drive Corporation was formed under the laws of the State of Missouri, the original incorporators being Abraham Davis, Wilda Forbes, and J. B. McReady, and the authorized capital stock of the corporation being 400 shares of common stock and 100 shares of preferred stock. In July 1953 all of the shares of common stock of the 7701 Shirley Drive Corporation were transferred to Melita and on December 1, 1953, Melita transferred title to the apartment building located at 7701 Shirley Drive to the corporation and took in return a mortgage in the amount of $44,000. Also, on or about December 1, 1953, Melita sold 100 shares of the common stock of 7701 Shirley Drive Corporation to Harry and Ivelou Kutchins for $3,000 and she sold another 100 shares of such stock to J.G. and Sidelia Hood for $3,500. J.G. and Sidelia Hood gave Melita a promissory note in the amount of $3,500 payable on January 4, 1954, and this note was paid on that date. *317 During January 1954 Melita sold another 100 shares of the common stock of 7701 Shirley Drive Corporation to Virginia Keith for $3,500, and in June 1954 she sold the final 100 shares of such common stock to Van H. and Fanetta Sutton for $4,400. The outstanding balances of the mortgage given by 7701 Shirley Drive Corporation to Melita as of December 31, 1953, 1954, and 1955 were $44,000, $42,458.11, and $40,693.63, respectively. Between March 1953 and January 1954, improvements were made to the apartment building at 7701 Shirley Drive for the selling of cooperative apartments in the building. The total cost of such improvements was approximately $17,500. When the internal revenue agent who was investigating petitioners' Federal income tax returns for the years 1953 and 1954 inquired of Herbert as to the transaction respecting the property at 7701 Shirley Drive, Herbert told him he had made improvements to this property in the total amount of $19,086.61, and at a meeting with this revenue agent on March 14, 1956, Herbert brought schedules, adding machine tapes, and cancelled checks which he stated supported the amount he stated had been spent on improvements. Among the checks which *318 Herbert had charged to repairs of the 7701 Shirley Drive property were checks totaling approximately $1,000 for personal expenditures of Herbert and Melita such as Blue Cross membership dues, groceries, repair of Melita's fur coat, Melita's automobile insurance, newspapers delivered to Herbert's personal residence, and cleaning and repair work done at that residence. Also among the checks were some drawn for appliances which were not used at 7701 Shirley Drive and for labor which was not performed at the Shirley Drive property. In addition to the payments by checks, Herbert included in the list of items 60 comprising the $19,086.61 amount some payments he stated were made in cash, and for which he showed to the internal revenue agent, documents which purported to be receipts. Some of these purported receipts showed the name of the purported recipient of the cash, which name was written on the purported receipt by Herbert. On December 12, 1949, Melita purchased 200 shares of Fundamental Investors, Inc., stock for $3,218. She purchased an additional 27 shares of this stock on February 23, 1951, for $508.95. On October 23, 1952, Melita purchased another 100 shares of Fundamental *319 Investors, Inc., stock for $2,098, and on December 27, 1951, Melita received a stock dividend of 6 shares of the stock which had a value at that date of $116.22. On December 27, 1952, Melita received another stock dividend of 6 shares of the stock which had a value at that date of $121.56. In 1954 Fundamental Investors, Inc., stock was split 2 for 1. On January 7, 1955, Melita sold her entire 678 shares of Fundamental Investors, Inc., stock for $9,145.52. During the period July 23, 1948, through September 29, 1952, Melita purchased a total of 930 shares of Affiliated Fund, Inc., stock for a total of $4,757.75. On October 27, 1952, Melita received a stock dividend of 22 shares of stock of Affiliated Fund, Inc., which had a value on that date of $103.82, and on October 27, 1953, she received a stock dividend of 13 shares which had a value on that date of $61.22. Melita sold all of her shares of Affiliated Fund, Inc., stock on December 10, 1954, for $5,499.20. It was the profit on the sale of this stock which was the additional profit on the sale of Affiliated Fund, Inc., reported by Herbert and Melita on their 1954 joint Federal income tax return. On November 16, 1955, the real estate *320 located at 505 West Polo Drive, Clayton, Missouri was sold by Herbert C. Camien as Trustee for Donald Camien and Patricia Camien. The sale price of the house was $32,500. The purchaser placed a first deed of trust of $30,000 on the property and the proceeds from this trust were paid to the seller on November 21, 1955. The amount of $319.24 was paid to Herbert by cashier's check at the closing of the sale. The balance of the selling price was composed of a $500 escrow which had apparently previously been deposited by the purchaser, a sales commission charged against the seller and certain small adjustments including documentary stamps, advertising, title search, and certain other small adjustments made at the closing. Herbert converted to his own use the entire $30,319.24 proceeds from the sale of the property at 505 West Polo Drive, Clayton, Missouri, thereby becoming indebted to the trust in that amount. On September 12, 1955, Herbert and Melita purchased a residence located at 12039 Conway Road in St. Louis County, Missouri for a purchase price of $42,000 and incurred $106.25 of expense in connection with the purchase. During the remainder of the year 1955 Herbert and Melita made *321 improvements to and obtained furnishings for the residence on Conway Road in the amount of $5,374.04. As of December 31, 1955, the residence together with the improvements and furnishings was still owned by Herbert and Melita. In connection with the purchase of the residence at 12039 Conway Road in September 1955, Herbert and Melita executed a note in the amount of $35,000 payable to the sellers, Fred L. and Florence A. Nierre, secured by a deed of trust covering the residence. During the year 1955 Herbert used $10,000 of the $30,319.24 proceeds received from the sale of 505 West Polo Drive to reduce the mortgage on the residence at 12039 Conway Road from $35,000 to $25,000 which was the amount of this mortgage at December 31, 1955. The balance of the $30,319.24 amount received by Herbert on the sale of 505 West Polo Drive was retained by Herbert for his personal use during the year 1955, part of this being spent in connection with the Conway Road property and its remodeling and furnishings. As of December 31, 1955, Herbert was indebted to the trust for Patricia and Donald Camien to the extent of $30,319.24. Herbert kept no formal books and records, and the only accounts kept of *322 his personal transactions were incomplete records such as check stubs, an incomplete daybook account, and certain receipted bills. Herbert's records of his financial transactions were not in good order and were incomplete and inaccurate. These records did not properly or accurately reflect his income or expenditures. The following statement shows a schedule of the assets and liabilities of Herbert and Melita as of December 31 of each of the years 61 1951 through 1955, the total of such assets and liabilities with the resultant net worth, and an indication of the increase or decrease in net worth for the year: Assets
12-31-51
12-31-52
Savings account #19068, St. Louis County National Bank,
Clayton, Missouri, in name of Melita Bange Howard or
Donald Howard
$ 50.00
$ 144.10
Checking account, Security National Bank, St. Louis,
Missouri, in name of Herbert C. Camien
.57
Checking account, American National Bank in St. Louis,
St. Louis, Missouri, in name of H.C. or Melita B.
Camien
21.10
150.99
Checking account, Northwestern Bank and Trust Co., St.
Louis, Missouri, in name of Melita Bange or Donald L.
Howard
206.86
108.18
Savings account #54837, Northwestern Bank & Trust Co.,
St. Louis, Missouri, in name of Melita Bange Howard or
Donald L. Howard
43.28
43.28
Savings account #78652, Northwestern Bank & Trust Co.,
St. Louis, Missouri, in name of Melita Howard or
Donald L. Howard
Checking account, First National Bank, Palm Beach,
Florida, in name of Melita B. Camien
Savings account #62993, Bank of St. Louis, St. Louis,
Missouri, in name of Mrs. Melita B. Camien
Checking account, First National Bank in Clayton,
Clayton, Mo., in name of Melita B. or H. C. Camien
Checking account, Mercantile Trust Co., St. Louis, Mo.,
in name of H.C. and Melita B. Camien
Laclede Gas Company, common stock:
100 shares
712.40
100 shares
717.40
100 shares
712.40
1 M face amount, Westinghouse Building bond
700.00
25 shares, Pacific Power & Light Company common stock
350.00
350.00
100 shares, Commonwealth Investment Corporation stock
714.00
714.00
20 shares, National Container Corporation convertible
preferred stock
525.00
525.00
30 shares, Columbia Terminal 6% preferred stock
750.00
50 shares, Arizona Public Service Company common stock
25 shares, U.C.L. Union Oil of California common stock
Gas Industries, Fund, Inc., stock:
50 shares
1,091.50
1 share (stock dividend)
1 share (stock dividend)
Fundamental Investors, Inc., stock:
200 shares
3,218.00
3,218.00
27 shares
508.95
508.95
100 shares
2,098.00
6 shares (stock dividend)
116.22
116.22
6 shares (stock dividend)
121.56
339 shares (stock split, 2 for 1)
Affiliated Fund, Inc., stock:
200 shares
$ 920.00
$ 920.00
80 shares
408.00
408.00
100 shares
530.00
300 shares
1,581.00
200 shares
1,056.00
35 shares
185.50
15 shares
77.25
22 shares (stock dividend)
103.82
13 shares (stock dividend)
$500 face amount, U.S. Government - 2 1/2% bond
500.00
500.00
$500 face amount, U.S. Government - 2 3/4% bond
551.79
551.79
Series "E" U.S. Government bonds:
$100 face amount
75.00
$50 face amount
37.50
Account, Bank of Acapulco, Acapulco, Mexico, in name of
Melita B. and/or Herbert C. Camien
Nash, 1955, automobile
Residence, 12039 Conway Road
Improvements to and furnishings, Conway Road residence
Notes receivable, J.G. and Sidelia Hood
Cash on hand
25,000.00
25,000.00
Mortgage receivable, 7701 Shirley Drive Corp
Notes receivable, Charles A. Tarantola [1]
4,216.75
Equity in 200 shares of capital stock, 7701 Shirley
Drive Corp
Accounts receivable, Pacific Sand and Gravel, Inc.
26,579.29
4,479.29
Investment in diamond ring
Paid-up insurance, Northwestern Mutual Life Insurance
Company
5,000.00
5,000.00
Total assets
$67,667.76
$54,549.18
*323 Assets
12-31-53
12-31-54
Savings account #19068, St. Louis County National
Bank, Clayton, Missouri, in name of Melita Bange
Howard or Donald Howard
$ 410.50
$ 5,732.21
Checking account, Security National Bank, St. Louis,
Missouri, in name of Herbert C. Camien
Checking account, American National Bank in
St. Louis, St. Louis, Missouri, in name of H.C. or
Melita B. Camien
6.21
Checking account, Northwestern Bank and Trust Co.,
St. Louis, Missouri, in name of Melita Bange or
Donald L. Howard
81.30
254.94
Savings account #54837, Northwestern Bank & Trust
Co., St. Louis, Missouri, in name of Melita Bange
Howard or Donald L. Howard
259.12
1,002.14
Savings account #78652, Northwestern Bank & Trust
Co., St. Louis, Missouri, in name of Melita Howard
or Donald L. Howard
Checking account, First National Bank, Palm Beach,
Florida, in name of Melita B. Camien
94.21
94.21
Savings account #62993, Bank of St. Louis, St. Louis,
Missouri, in name of Mrs. Melita B. Camien
100.00
Checking account, First National Bank in Clayton,
Clayton, Mo., in name of Melita B. or H. C. Camien
135.19
Checking account, Mercantile Trust Co., St. Louis,
Mo., in name of H.C. and Melita B. Camien
(1.77)
Laclede Gas Company, common stock:
100 shares
100 shares
100 shares
1 M face amount, Westinghouse Building bond
25 shares, Pacific Power & Light Company common stock
350.00
350.00
100 shares, Commonwealth Investment Corporation stock
714.00
20 shares, National Container Corporation convertible
preferred stock
525.00
525.00
30 shares, Columbia Terminal 6% preferred stock
750.00
750.00
50 shares, Arizona Public Service Company common
stock
850.00
850.00
25 shares, U.C.L. Union Oil of California common
stock
Gas Industries, Fund, Inc., stock:
50 shares
1,091.50
1,091.50
1 share (stock dividend)
20.60
20.60
1 share (stock dividend)
20.26
Fundamental Investors, Inc., stock:
200 shares
3,218.00
3,218.00
27 shares
508.95
508.95
100 shares
2,098.00
2,098.00
6 shares (stock dividend)
116.22
116.22
6 shares (stock dividend)
121.56
121.56
339 shares (stock split, 2 for 1)
Affiliated Fund, Inc., stock:
200 shares
$ 920.00
80 shares
408.00
100 shares
530.00
300 shares
1,581.00
200 shares
1,056.00
35 shares
185.50
15 shares
77.25
22 shares (stock dividend)
103.82
13 shares (stock dividend)
61.22
$500 face amount, U.S. Government - 2 1/2% bond
500.00
$ 500.00
$500 face amount, U.S. Government - 2 3/4% bond
551.79
551.79
Series "E" U.S. Government bonds:
$100 face amount
75.00
$50 face amount
37.50
Account, Bank of Acapulco, Acapulco, Mexico, in name
of Melita B. and/or Herbert C. Camien
1,200.00
Nash, 1955, automobile
Residence, 12039 Conway Road
Improvements to and furnishings, Conway Road
residence
Notes receivable, J.G. and Sidelia Hood
3,500.00
Cash on hand
25,000.00
25,000.00
Mortgage receivable, 7701 Shirley Drive Corp
44,000.00
42,458.11
Notes receivable, Charles A. Tarantola [1]
4,216.75
Equity in 200 shares of capital stock, 7701 Shirley
Drive Corp
1,034.54
Accounts receivable, Pacific Sand and Gravel, Inc.
14,395.74
11,529.29
Investment in diamond ring
3,100.00
Paid-up insurance, Northwestern Mutual Life Insurance
Company
5,000.00
5,000.00
Total assets
$110,120.03
$106,326.20
*324 Assets
12-31-55
Savings account #19068, St. Louis County National Bank,
Clayton, Missouri, in name of Melita Bange Howard or
Donald Howard
$ 6,031.26
Checking account, Security National Bank, St. Louis,
Missouri, in name of Herbert C. Camien
Checking account, American National Bank in St. Louis,
St. Louis, Missouri, in name of H.C. or Melita B.
Camien
Checking account, Northwestern Bank and Trust Co., St.
Louis, Missouri, in name of Melita Bange or Donald L.
Howard
Savings account #54837, Northwestern Bank & Trust Co.,
St. Louis, Missouri, in name of Melita Bange Howard or
Donald L. Howard
Savings account #78652, Northwestern Bank & Trust Co.,
St. Louis, Missouri, in name of Melita Howard or
Donald L. Howard
10,462.93
Checking account, First National Bank, Palm Beach,
Florida, in name of Melita B. Camien
Savings account #62993, Bank of St. Louis, St. Louis,
Missouri, in name of Mrs. Melita B. Camien
101.37
Checking account, First National Bank in Clayton,
Clayton, Mo., in name of Melita B. or H. C. Camien
675.85
Checking account, Mercantile Trust Co., St. Louis, Mo.,
in name of H.C. and Melita B. Camien
4.53
Laclede Gas Company, common stock:
100 shares
100 shares
100 shares
1 M face amount, Westinghouse Building bond
25 shares, Pacific Power & Light Company common stock
350.00
100 shares, Commonwealth Investment Corporation stock
20 shares, National Container Corporation convertible
preferred stock
30 shares, Columbia Terminal 6% preferred stock
750.00
50 shares, Arizona Public Service Company common stock
850.00
25 shares, U.C.L. Union Oil of California common stock
1,235.01
Gas Industries, Fund, Inc., stock:
50 shares
1,091.50
1 share (stock dividend)
20.60
1 share (stock dividend)
20.26
Fundamental Investors, Inc., stock:
200 shares
27 shares
100 shares
6 shares (stock dividend)
6 shares (stock dividend)
339 shares (stock split, 2 for 1)
Affiliated Fund, Inc., stock:
200 shares
80 shares
100 shares
300 shares
200 shares
35 shares
15 shares
22 shares (stock dividend)
13 shares (stock dividend)
$500 face amount, U.S. Government - 2 1/2% bond
$ 500.00
$500 face amount, U.S. Government - 2 3/4% bond
551.79
Series "E" U.S. Government bonds:
$100 face amount
$50 face amount
Account, Bank of Acapulco, Acapulco, Mexico, in name of
Melita B. and/or Herbert C. Camien
2,200.00
Nash, 1955, automobile
1,442.20
Residence, 12039 Conway Road
42,106.25
Improvements to and furnishings, Conway Road residence
5,374.04
Notes receivable, J.G. and Sidelia Hood
Cash on hand
25,000.00
Mortgage receivable, 7701 Shirley Drive Corp
40,693.63
Notes receivable, Charles A. Tarantola [1]
Equity in 200 shares of capital stock, 7701 Shirley
Drive Corp
Accounts receivable, Pacific Sand and Gravel, Inc.
11,529.29
Investment in diamond ring
3,100.00
Paid-up insurance, Northwestern Mutual Life Insurance
Company
5,000.00
Total assets
$159,090.51
*325 62 Liabilities
12-31-51
12-31-52
12-31-53
12-31-54
12-31-55
Notes payable,
$ 1,500.00
Security National
Bank Savings &
Trust Co.
Notes payable,
601.00
$601.00
Pat Walsh Loan
Co.
Notes payable,
1,248.00
Manchester Bank
of St. Louis, St.
Louis, Mo.
Notes payable,
$15,000.00
$ 6,500.00
First National
Bank of Clayton,
Clayton, Mo.
Notes payable,
17,500.00
Clyde B. Denton
Mortgage payable,
$21,750.00
Mercantile Trust
Co., St. Louis,
Mo.
Notes payable,
25,000.00
Fred L. and
Florence A.
Nierre
Accounts payable,
30.43
2,673.51
2,894.44
Pacific Sand and
Gravel, Inc.
Loan from trust
30,319.24
to Herbert C.
Camien
Total liabilities
$20,849.00
$631.43
$21,750.00
$17,673.51
$64,713.68
*326 SUMMARY
12-31-51
12-31-52
12-31-53
12-31-54
12-31-55
Total assets
$67,667.76
$54,549.18
$110,120.03
$106,326.20
$159,090.51
Less: Total
20,849.00
631.43
21,750.00
17,673.51
64,713.68
liabilities
Net worth
$46,818.76
$53,917.75
$ 88,370.03
$ 88,652.69
$ 94,376.83
Less: Net worth
46,818.76
53,917.75
88,370.03
88,652.69
at end of
previous year
Increase or
$ 7,098.99
$ 34,452.28
$ 282.66
$ 5,724.14
(decrease) in net
worth for year
During the years 1952 through 1954, Herbert paid income taxes of $206.80, $1,463.69, and $959.48, respectively, the amount paid in 1952 being by withholding, and the amounts paid in 1953 and 1954 being for 1949 and 1950 taxes, respectively. During the year 1952 petitioners or their wholly owned corporation, Pacific paid real estate taxes and mortgage payments on the property at 505 West Polo Drive in the amount of $2,012.93. During the year 1953 petitioners or their wholly owned corporations, Pacific or 7701 Shirley Drive Corp., paid real estate taxes, mortgage payments, and a payment for remodeling the kitchen at 505 West Polo Drive in the amount of $4,442.56. During the year 1954 *327 petitioners or their wholly owned corporations paid real estate taxes and mortgage payments in the amount of $935.86 with respect to the property at 505 West Polo Drive. During the year 1955 petitioners or their wholly owned corporations made payments of real estate taxes and mortgage payments with respect to the property at 505 West Polo Drive in the total amount of $4,735.25. On December 30, 1952, Herbert made a gift of $1,000 to John T. Shannon, his son-in-law, by drawing a check on Pacific and charging the amount to his own account with Pacific. During the year 1953 Herbert paid educational expenses of his son, Donald, in the amount of $2,000. On March 2, 1954, Herbert had a cashier's check drawn in the amount of $1,000 to his son, Donald, and had cashier's checks in the amounts of $4,000, $3,500, and $4,000 drawn to Donald R. Camien, his son, on October 27, 1955, November 23, 1955, and December 27, 1955, respectively. Herbert provided the funds for the cashier's checks which he had drawn for Donald. During the years 1952, 1953, 1954, and 1955 petitioners had personal and living expenses in the amounts of $7,581.21, $8,732.48, $9,520.59, and $9,057.39, respectively. During *328 the years 1952, 1953, 1954, and 1955 petitioner had capital gains and capital gain dividends, the portions of which not recognizable for income tax purposes being in the amounts of $395.48, $72.41, $671.04, and $1,677.72, respectively. On April 13, 1960, a complaint was filed against Herbert with the United States Commissioner for the Eastern District of Missouri, charging Herbert with willfully and knowingly attempting to evade income tax owing by him and Melita for the year 1953 by filing a false and fraudulent joint income tax return for that year. A warrant for the arrest of Herbert was issued on April 13, 1960, and on April 14, 1960, Herbert filed a preliminary appearance bond. On April 21, 1960, an indictment was filed against Herbert in the United States District Court for the Eastern District of Missouri, charging him with willfully and knowingly attempting to evade and defeat income taxes owing by him and Melita for the years 1953, 1954, and 1955 by filing false and fraudulent joint income tax returns for those years. On November 14, 1960, Herbert pleaded guilty to willfully and knowingly attempting to evade and defeat a large part of the income taxes due and owing by him *329 and Melita for the years 1953 and 1955 by filing and causing to be filed false and fraudulent income tax returns for those years. On December 15, 1960, Herbert was found guilty as charged for the years 1953 and 1955 and judgment of conviction was entered against him on that date as to both of the years 1953 and 1955. As to the year 1953, the sentence included the imposition of a fine and a suspended jail sentence and as to the year 1955 the Court suspended the imposition of punishment and placed Herbert on probation. The Court stated that one of the conditions of the probation was that Herbert adjust and straighten up his matters with the Internal Revenue Service, the Court stressing that this did not mean that Herbert was not entitled to pursue any legal defense or legal right he had with respect to the taxes proposed to be asserted against him by representatives of the Internal Revenue Service. Herbert had previously, in 1921, been convicted of a felony. He had prior to 1921 been president of an accounting firm in St. 64 Louis, Missouri, and as a member of the firm had done accounting work for a motor company, during which employment he embezzled money which resulted in *330 his indictment in 1921 of grand larceny and embezzlement, of which crime he was convicted in 1925. Respondent in his notice of deficiency determined Herbert's and Melita's joint income tax liabilities for the taxable years 1952, 1953, 1954, and 1955 on the net worth plus expenditures basis. Petitioners contend that there are errors in certain specific items, the major items with respect to which there is disagreement being the following: (1) The amount of cash on hand as of the beginning date of the net worth statement, December 31, 1951. (2) Whether petitioners had any basis in the capital stock of Pacific. (3) The amounts due to petitioners from Pacific as of December 31, 1951, December 31, 1952, and December 31, 1955. (4) Whether petitioner had some surplus equipment as of December 31, 1951 and December 31, 1952. (5) Whether there was $2,000 more in notes due to petitioner from Tarantola as of December 31, 1951, than respondent determined in his net worth statement. (6) Whether there should be included any amount as of December 31, 1955, representing the value of a diamond ring which was stolen in that year when the insurance with respect to the ring was not actually *331 paid to petitioners until the following year. There is also disagreement between the parties as to the amount of petitioners' living expenses, the amount owed to the trust account by Herbert as of December 31, 1955, and the extent to which items paid by petitioners with respect to property owned by the trust or paid out to Donald and Patricia Camien should be added to petitioners' net worth as distinguished from being considered as repayments of trust funds which Herbert had previously used for his own benefit. Ultimate Facts as to Years 1952, 1953 and 1955 Petitioners had unreported net income in the years 1952, 1953, 1954, and 1955 in the respective amounts of $5,894.93, $73,657.06, * $9,787.17, and $26,744.07. *
Part of the deficiency in petitioners' income tax in each of the years 1952, 1953, 1954, and part of the underpayment for the year 1955 was due to fraud. For each of the years 1952, 1953, 1954, and 1955 petitioners filed false and fraudulent income tax returns with intent to evade tax. Opinion Although respondent *332 determined petitioners' income for the year 1951 on the basis of specific items and determined petitioners' income for the years 1952 through 1955 on a net worth method, the issues with respect to all years are purely factual. To a large extent these issues have been disposed of by our Ultimate Findings of Fact, both for the year 1951 and the years 1952 through 1955. For the year 1951 respondent had no record of a return filed by Herbert, and Herbert had no retained copy of any such return, although he testified that he believed he did file a return for that year. In addition to there being no record of respondent's having ever received a return filed by Herbert for the year 1951, the evidence shows that the only payment made by Herbert for the year 1951 was the amount withheld by Denton Sand & Gravel Company and Pacific from salary payments to Herbert in that year. Weighing all the evidence and particularly considering it in connection with the general unreliability of Herbert's testimony which we will discuss in more detail later, we have concluded that respondent has shown by a preponderance of the evidence that no income tax return was filed by Herbert for the year 1951. Therefore, *333 a determination of deficiency for the year 1951 is not barred by the statute of limitations. Also, our determination that Herbert filed no income tax return for the year 1951 and showed no reasonable cause for failure to file such return requires sustaining respondent with respect to the addition to tax under the provisions of section 291, I.R.C. 1939, for failure to file a return within the time prescribed by law. The evidence also shows that Herbert did not file a declaration of estimated tax for the year 1951 and respondent's addition to 65 tax under section 294(d)(1)(A), I.R.C. 1939, for failure to file a timely declaration of estimated tax for the year 1951 is sustained to the extent that it is applicable under our determination that the $11,000 in notes drawn to Herbert by the Trantolas did not constitute income to Herbert in the year 1951. The one largest item of income which respondent determined Herbert received in 1951 was $11,000 which he determined Herbert received from Denton Sand & Gravel Company. While the parties are not in precise agreement as to the facts surrounding the two notes for $11,000 drawn to Herbert, signed by Tarantola and his wife, there is less *334 disagreement in this regard than there is with respect to many of the other facts in this record. Both parties recognize that sometime before 1951 Herbert had been given a note of Denton Sand & Gravel Company for $30,000 and that at some juncture this note was being held by Simmons who was the attorney for both Tarantola and Herbert. Both parties also recognize that the $11,000 in notes given to Herbert by Tarantola and his wife was in replacement of the $30,000 note. There is some disagreement as to whether the two notes totaling $11,000 were turned over to Simmons to hold, and if so, how long he held them. Considering the financial condition of Denton Sand & Gravel Company, there would be some question whether the $30,000 note from Denton had any value or any substantial value when it was given to Herbert. However, it does appear that some of the work for which the note was given represented work which Herbert had done for Tarantola personally and other business interests of Tarantola, and not work for Denton Sand & Gravel Company. While the record is not as clear as it might be with respect to the underlying arrangements when the $11,000 in notes of Tarantola and his wife was *335 drawn payable to Herbert in settlement or replacement of the $30,000 note of Denton Sand & Gravel Company, we have concluded that the preponderance of the evidence shows that the $30,000 note and the $11,000 in notes were merely evidence of indebtedness of Denton and Tarantola to Herbert for services rendered and not payment for those services. The evidence shows that the $11,000 in notes was held by Simmons for some length of time, which is additional indication that the notes were not intended as payment. We have, therefore, concluded from the evidence that respondent was in error in increasing petitioner's 1951 income by the $11,000 amount. The other amount for the year 1951 which is in controversy between the parties is $2,144.56 which respondent determined represented commissions from Denton Sand & Gravel Company and Pacific paid to Herbert. The evidence shows that these amounts were listed as commissions on the books of Denton Sand & Gravel Company and they were listed on the cash disbursements ledger of Pacific under brokerage and commissions. It is Herbert's contention that these amounts were payments on a $2,500 note of Construction Equipment Company which he had received *336 in 1948. Herbert testified that he had jotted the amounts down in a little daybook at the time they were paid and that at some later date after the investigation of his tax liability for the year 1951 was commenced, he placed the amounts on the back of the $2,500 note as indicating the payments on that note. Herbert claimed to have received Construction Equipment Company's note for $2,500 in connection with a purchase of machinery. According to Herbert's contention, Construction Equipment Company had become indebted to him in the amount of $27,500 for amounts which Melita had given to Herbert for Herbert to loan to Tarantola. Herbert contends that on October 30, 1948, he took two Diesel engines, models D 17000, and one Caterpillar tractor, model D 7, in satisfaction of $25,000 of Tarantola's debt to him and took Construction Equipment Company's 60-day demand note in the amount of $2,500 for the balance of the $27,500. Respondent produced evidence at the trial to show that the two Diesel engines and the Caterpillar tractor which Herbert claimed to have taken in satisfaction of the $27,500 debt owed to him by Tarantola and Construction Equipment Company were in fact machines, as disclosed *337 by the serial numbers of the machines used by Herbert, which were sold by the makers to persons other than Construction Equipment Company and in the possession of the other persons or purchasers from them both in 1948 when Herbert claimed to have acquired the machinery and in 1951 when, as will be later discussed, Herbert claimed to have turned the machinery over to Pacific. We therefore conclude that however Herbert obtained the $2,500 note of Construction Equipment Company dated October 30, 1948, he did not obtain it in connection with a machinery purchase from Construction Equipment Company. Apparently the note was legitimate 66 since both Tarantola and Strebler identified their signatures. However, neither Tarantola nor Strebler remembered in what connection the note was given to Herbert, and Herbert was unable to explain how, if the note was paid in full, he still had it in his possession. The evidence also shows that in 1948 Construction Equipment Company was in bad financial condition, that all of its equipment was mortgaged by chattel mortgages to the bank, and that some of its equipment had been mortgaged to three separate banks. This evidence indicates that Herbert *338 could not have obtained any of the equipment on October 30, 1948, in satisfaction of an indebtedness. Herbert may have obtained the Construction Equipment Company's note as evidence of indebtedness for services. However, we will not speculate as to how Herbert acquired this note since we are convinced that the amounts received by Herbert in 1951 from Denton Sand & Gravel Company and Pacific were not payments on this note. The note is nowhere else in any of the computations of assets of Herbert. We place far more reliance on the books of Denton Sand & Gravel Company and Pacific than we do on Herbert's testimony. We, therefore, sustain respondent with respect to the inclusion of commissions of $2,144.56 in Herbert's 1951 income. The most difficult issue as to the year 1951 is whether respondent has shown by clear and convincing evidence that any portion of the deficiency in Herbert's tax for that year is due to fraud with intent to evade tax. Certainly, no fraud existed with respect to the $11,000. We have determined that it was not income in the year 1951. However, the fact that Herbert put respondent on notice as to the receipt of the $11,000 in notes in his 1952 income tax return *339 would tend to show that the omission of any reference to those notes in 1951 was not fraudulent. Except for the facts with respect to the years 1952 through 1955, we would have no difficulty in concluding that Herbert's failure to file a return for 1951 was not with a fraudulent intent to evade tax and that no portion of the deficiency for the year 1951 was due to fraud. Herbert, as recipient of both salary and commissions from Denton Sand & Gravel Company and Pacific, might reasonably have assumed that taxes were being withheld on both and that in fact his taxes might well have been overpaid by withholding for the year 1951. Herbert's explanation at the trial of the payments received from Denton Sand & Gravel Company and Pacific suggests fraud. However, weighing all the evidence as to the year 1951, we have concluded that the evidence is not clear and convincing that any portion of the deficiency for that year was due to fraud. The situation is quite different with respect to the years 1952 through 1955. For those years respondent has shown specific items of income omitted by Herbert from the gross income reported on his and Melita's joint income tax returns and has also shown that *340 Herbert had sufficient knowledge of what constituted gross income to know the items were includable in his gross income. There is no question that for 1952, 1953, 1954, and 1955 Herbert received $2,500, $150, $3,200, and $6,000, respectively, from Otto Wilke, which income he failed to report on his income tax returns. Herbert claims that a substantial part of these amounts was paid out in expenses and that he returned $5,000 of the $6,000 paid in 1955 to Otto Wilke. The evidence shows that Herbert had some expenses in connection with his services to Otto Wilke but that he did not return $5,000 of the $6,000 payment to Otto Wilke. The evidence does not show the amount of expenses which Herbert had but does show that Herbert was sufficiently aware of what constituted taxable income to know that his receipts from Otto Wilke were part of his gross income and that he should deduct any expenses which he had. Under the circumstances of this case these items alone might be considered sufficient to show Herbert's returns to be false and fraudulent. However, respondent has shown substantial understatements of income in each of the years 1952 through 1955 as shown by the net worth statements *341 which we will hereinafter discuss and has also shown that in 1953 Herbert received from Pacific over $50,000 resulting from a transaction which Herbert did not even mention on his income tax return and that in 1953 and 1954 Melita had income resulting from the transfer to a corporation of the property at 7701 Shirley Drive and the sale of corporate stock of that corporation. Herbert did not report any income from these transactions on his income tax returns for 1953 and 1954. Considering all of the evidence presented in this case we conclude that respondent has shown by clear and convincing evidence that a part of the deficiency in petitioners' income tax for each of the years 1952, 1953, 67 and 1954, and part of the underpayment in 1955 was due to fraud and that the returns filed for each of these years were false and fraudulent with intent to evade tax. Because of our conclusion that respondent has shown fraud by clear and convincing evidence, assessment of deficiencies for the years 1952 through 1955 is not barred by the statute of limitations. It is unnecessary for us to decide an issue argued at some length by the parties of whether Herbert's having been convicted of filing *342 and causing to be filed false and fraudulent Federal income tax returns for the years 1953 and 1955 would collaterally estop Melita, as well as Herbert himself, from denying that the joint income tax returns filed by Herbert and Melita for the years 1953 and 1955 were false and fraudulent. See John W. Amos, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965), and Arcitic Ice Cream Co., 43 T.C. 68 (1964), holding that a taxpayer who has been criminally convicted of filing false and fraudulent income tax returns for certain years is collaterally estopped from denying that his income tax returns for those years were false and fraudulent in a case involving civil tax liabilities and the addition to tax for fraud. [1]
*343 The evidence shows that Herbert kept no regular set of books and that the few records he had were sketchy and totally inadequate to form the basis of computations of income. Recognizing this fact, petitioners do not specifically attack the use by respondent of a net worth method to determine the amount of petitioners' income in each of the years 1952 through 1955, as distinguished from contending that certain items in the net worth statement prepared by respondent are so in error as to destroy the whole statement. Petitioners contend that a proper net worth statement shows that petitioners had no unreported net income in any of the years 1952 through 1955. Only a few items of the many set forth on the net worth statement prepared by respondent are in issue, but the items that are in issue are substantial in amount. The first item on the net worth statement prepared by respondent which petitioners contest is the amount of cash on hand. Petitioners claim to have had cash on hand as of December 31, 1951, in the amount of $44,000 consisting of the $25,000 cash which both petitioners and respondent agree Melita had on hand as of the end of each year here in issue, and $19,000 which *344 petitioners claim that Herbert had on hand as of December 31, 1951, but not at December 31, 1952, or thereafter. Herbert contends that of the $19,000 which he had on hand, $9,000 was given to him on June 16, 1944, by his then father-in-law, Edward H. Rupert, in the form of two cashier's checks. He claims that he had kept the cash in a strong box since June 16, 1944, when it was given to him. To support the alleged gift, Herbert offered in evidence a document dated June 16, 1944, addressed, "Dear Herb" and purportedly signed by Edward H. Rupert in which reference was made to differences arising in the settlement of the affairs of Rupert Realty Company and a desire to have pleasant family relations again. This purported letter contained a statement that two cashier's check for $4,500 each, which was about the amount received for the properties which caused the disagreement, were enclosed. The purported letter concluded with the statement, "Let's call it a gift to you without any strings attached." Herbert testified that the other $10,000 composing the $19,000 came to him on December 14, 1949, as the corpus of a trust created on October 26, 1939, with Marie L. Brace as the donor and *345 Arthur U. Simmons as the trustee. The document offered in evidence by Herbert, which he testified was the trust agreement provided that the trustee should at his discretion turn over the $10,000 of money and the proceeds therefrom to Herbert at such time as he felt certain Herbert had cleared up all judgments of record or all pending claims against him. The document further stated that in the event Herbert should be deceased or had failed to clear up all pending claims against him and judgments of record by January 1, 1950, the trustee was authorized to turn the $10,000 and proceeds therefrom over to a specifically named charity. It is Herbert's testimony that when he receiven the $10,000 on December 14, 1949, he 68 placed it in the box with the $25,000 of cash of Melita's. Herbert's testimony as to the $9,000 cash and the interest in the $10,000 trust directly conflicts with the sworn statement which he made listing his assets as of January 27, 1947. In that affidavit Herbert listed as his only assets an insurance policy with no cash surrender value and a contingent fund from Crown Can Company of $1,400 to $1,600. On the sworn statement Herbert specifically stated that he had *346 no assets, actual or contingent, other than those listed. If Herbert had $9,000 in cash and was the beneficiary of a trust as of January 27, 1947, which would necessarily be the fact if his testimony in this case with respect to the source of the cash he claims he had on hand as of December 31, 1951, is to be believed, his sworn statement of his assets as of January 27, 1947, is totally untrue. If his sworn statement filed in support of an offer to compromise Federal income taxes is correct, then his testimony with respect to his cash on hand as of December 31, 1951, cannot be accepted as true. Considering not only Herbert's testimony with respect to his cash on hand, but other statements made by Herbert at the trial of this case, his evasiveness in attempting to explain inconsistencies and certain of his statements which were shown by credible documentary evidence to be untrue, we have concluded that we do not believe that Herbert had $19,000 cash on hand as of December 31, 1951. The next item with respect to which the parties differ is notes receivable from Tarantola. In the net worth statement offered at the trial, the notes receivable as of December 31, 1951 and December 31, 1952, were *347 shown by respondent as $11,000 and $9,216.71, respectively. The $11,000 item and $5,000 of the $9,216.71 represented the notes from Tarantola and his wife which respondent had included in petitioners' income for the year 1951. Respondent makes an alternative contention that if we agree with Herbert that these notes were not income in 1951, then petitioners had no basis in these notes and they should not be included as assets on a net worth statement which includes items of property at their basis. Petitioners do not contend to the contrary of this, and we agree that since these notes were merely evidence of an amount owed to Herbert and not indebtednesses with a basis to petitioners, they are not properly includable in the net worth statement. Petitioners, however, contend that in addition to the notes from Tarantola to Herbert as included in respondent's computation, Herbert had lent amounts to Tarantola, which amounts were additional assets on hand as of December 31, 1951, in the total amount of $2,000. Herbert testified that the $2,000 amount was composed of a note for $1,500 and an indebtedness for which he was given no note in the amount of $500. The basis for this contention *348 by petitioners is, with respect to the $1,500 note, the testimony of Herbert that the net worth statement as prepared by him shows a note of Tarantola of $1,500 which he did not have with him since Tarantola had paid it, but which he did own on December 31, 1951. He testified that he had no memorandum of payment but he recalled being paid. Herbert testified that the $500 which he said Tarantola owed him at December 31, 1951, was a loan which he made to Tarantola around Christmas-time 1951. He stated that he was having dinner with Tarantola 2 or 3 days before Christmas and Tarantola said that they were having a "tough time." Although business was good, Tarantola had everything but cash. Herbert stated that he told Tarantola he was going over to the bank to pay a note off, and Tarantola said it would be a pretty rough Christmas around the office and Herbert lent Tarantola $500 to give to employees in the office at Christmas. When this testimony is considered in the light of the other evidence of record (particularly the evidence with respect to the lease-purchase agreement between Pacific and Tarantola under which Pacific was paying Tarantola rental on the equipment of $106,250 a *349 year and the fact that Herbert owned all of the stock of Pacific and Tarantola was merely manager because of the lease-purchase agreement), we do not consider this testimony creditable. If petitioner ever made any such loans to Tarantola, we doubt that they were made and outstanding at the end of 1951. If the transaction to which Herbert referred took place at all, it was far more likely to have occurred in 1950 when Herbert was working for Denton Sand & Gravel Company and other business interests of Tarantola. When the improbability of the existence of any further indebtedness of Tarantola to petitioner is considered in conjunction with the generally unsatisfactory testimony of Herbert, we do not consider the evidence adequate to support petitioners' claim with respect to the additional $2,000 indebtedness 69 from Tarantola. Much of the testimony of Herbert at the trial as we have stated heretofore in this opinion was shown to be erroneous by respondent. In fact, from observing Herbert as a witness and noting his evasive answers to questions and lack of memory with respect to various items, we would be unwilling to accept Herbert's testimony except where it is sufficiently corroborated *350 by documents or other evidence of record which are independently persuasive, even if some of his testimony had not been directly shown to be untrue. The next major item at issue between the parties involves the amount due by Pacific to Herbert as of December 31, 1951, 1952, 1954, and 1955, and whether there should be included in addition to the amounts due by Pacific to Herbert an amount representing Herbert's basis in the stock of Pacific. Petitioners contend that as of December 31, 1951, and December 31, 1952, in addition to the amount which both parties recognize as due Herbert by Pacific, there should be included $25,000 representing the amount due to Herbert by Pacific for materials and supplies. On checking the records before us, it appears to us that as of December 31, 1951, there was an outstanding amount due to Herbert by Pacific of $25,000 for materials and supplies and the only further amount due to him by Pacific as of December 31, 1951, was $1,579.29. Since this item is contested between the parties, we have used the amounts that we found on the records of Pacific and have found that as of December 31, 1951, there was $25,000 due to Herbert by Pacific for supplies *351 and materials and an additional amount of $1,579.29 due from Pacific to Herbert, making a total of $26,579.29. The records of Pacific show that as of July 1, 1952, an amount of $25,000 which Herbert admitted represented the equipment and supplies he turned over to Pacific was carried over to one of Herbert's personal accounts on the books of Pacific. As of December 31, 1952, there was no credit balance in this account on Pacific's books. While we do not understand in detail how the parties arrived at $4,479.29 as the amount due Herbert by Pacific as of December 31, 1952, we are convinced that no portion of the amount due Herbert for equipment and supplies at the end of 1951 was still due to him at the end of 1952. Since the parties both agree that $4,479.29 was due from Pacific to Herbert as of December 31, 1952, aside from any amount with respect to supplies and equipment, we have used that amount in the net worth statement contained in our findings even though we are unable to arrive at that exact figure from the records in evidence. Although petitioners contend that the total amount due by Pacific to Herbert at December 31, 1954 and 1955 was $1,779.29, the books and records *352 of Pacific show that at December 31, 1955, there was due to Herbert from Pacific the amount of $11,529.29. This $11,529.29 is the total of the amounts in Herbert's and Donald's accounts on the books of Pacific and the parties agree that Donald's accounts on the books belonged to Herbert. The $11,529.29 total of the two accounts is the amount we have included in the net worth statement as of December 31, 1954 and 1955. Petitioners claim that as of December 31, 1951, Herbert had a basis of $50,000 in the stock of Pacific in addition to his basis in materials and supplies in a total amount of $25,000. The mining leases which Herbert had obtained for Pacific were set up on the books of Pacific at $50,000 and capital stock was credited with $50,000. While these leases undoubtedly had a value which may have been $50,000 or more, the evidence is completely clear that the leases did not cost either Herbert or Pacific anything. This evidence is so clear that Herbert does not even contend that he or Pacific had any basis in the leases as such. Herbert testified that the $50,000 basis he had in Pacific's stock was composed of two other items, one being a borings chart which he claimed to *353 have purchased from Simmons for $25,000 and the other some machinery. Herbert testified that in payment for the borings chart he cancelled a note due to him as trustee for Patricia and Donald from Simmons for $24,500 and paid Simmons $500 in cash. The note was stated to be dated December 22, 1948, and to have been given by Simmons to Herbert as trustee for Donald and Patricia in return either for an assignment by Herbert to Simmons of 6,000 shares of stock in Whitehouse Canneries Company, Inc., or for some warehouse receipts for asparagus manufactured by Whitehouse Canneries Company, Inc. The evidence shows that Whitehouse Canneries Company, Inc., was dissolved and declared bankrupt in 1942. Herbert attempted to explain this discrepancy by stating that he had been dealing with Simmons on this matter over a period of 8 to 10 years. When agents of respondent were investigating this case Herbert had handed them documents in purported support of a 70 payment made to Charles E. Ewing of $50,000 for the leases that were granted to Pacific. At the trial Herbert stated that Charles E. Ewing was a "straw man" for Simmons and claimed that the document which had been presented to respondent's *354 agent was part of his dickering throughout the years with Simmons. Respondent offered proof that "Charles E. Ewing" was a fictitious person. Another factor which is never explained in the record is why the mining leases were shown as the property received for Pacific's capital stock if in fact the stock was issued for a borings chart and machinery. The machinery that Herbert testified he transferred to Pacific for the remaining $25,000 value of the stock which he obtained was listed by him on a purported invoice with machine numbers. The evidence shows that the companies that manufactured the machinery with those particular numbers had sold machines with those numbers to other persons not in the close vicinity of Pacific, Missouri, and that the persons who had purchased the machines had retained the machines past October 30, 1948, when Herbert testified he purchased them. In some instances the machinery was still in the hands of its original purchaser on the date Herbert testified he transferred it to Pacific. Although we recognize that the stock of Pacific had value to a large extent because of the value of Pacific's mining leases, we conclude from the evidence that Herbert and *355 Melita had no basis in the Pacific stock. The stock of Pacific cost Herbert and Melita nothing in money or property. As our findings show, Herbert obtained the mineral leases for Pacific. The stock of Pacific was issued to Herbert and Simmons prior to the date the leases were obtained, so it is not reasonable to assume that it was issued for Herbert's services in obtaining the leases. However, if it were issued for such services, which probability neither party suggests, no amount representing its value was included by Herbert in income, so he must have considered that it had no ascertainable value. In any event, this record shows no cost or other basis of the Pacific stock to Herbert. It is the cost or tax basis of assets to a taxpayer which is material in a net worth computation since disposition of assets at amounts in excess of cost will result in income. See Holland v. United States, 348 U.S. 121 (1954). Of course, if the gain from sale of an asset is capital gain, a proper adjustment to the increase in net worth for the nontaxable portion of such gain is required. Although petitioners take the position that the Pacific stock should be included as an asset at a *356 value of $50,000 on December 31, 1951, and $25,000 on December 31, 1952, they include no value for the stock at any time thereafter. Insofar as this record shows, Herbert, Melita, and Donald continued to own their Pacific stock throughout the period here involved. In December 1952, the paid-in capital on Pacific's books was reduced to $25,000. All the leases had been sold by Pacific prior to that date and the records of Pacific which are in evidence do not show the account to which a debit was made for the credit of the $25,000 to capital stock. However, there is nothing in the record to indicate that when Herbert in January 1953 retained for his own use the $53,125 paid by Pacific Pebbles to Pacific, that all or any of his Pacific stock was cancelled. Therefore, if the Pacific stock had any basis to Herbert, petitioners do not explain how the amount of such basis disappeared from the net worth computation after the year 1952. The next disputed item in the net worth computation is an asset which petitioners claim Herbert had on hand as of December 31, 1951 and 1952, which he traded for an item turned over to Pacific in 1953. This item is referred to by petitioners as "Sun Equipment *357 - Surplus" in the amount of $2,600. Herbert's testimony was that at some undisclosed time he bought some surplus mechanical equipment for finding defects in electrical equipment from the United States Government. He stated that the equipment was five or six sets of testing equipment which he bought from the United States Army Surplus at a cost of $2,600. He stated that he could not dispose of the equipment he had purchased and at some undisclosed time he traded it for some generators, crane hoists, lifts, pipes and fittings, and galvanized wire and rope of a total value of approximately $9,000. He stated that the equipment he received for the "Sum equipment" was turned over to Pacific sometime in 1953. Herbert had no documents to support this testimony. The facts show that by 1953 the leases and operating equipment of Pacific had been purchased by Pacific Pebbles, an unrelated company. Herbert made no explanation of why he would turn over equipment to Pacific after the sale of the operating assets of Pacific to Pacific Pebbles. He likewise did not disclose where or how the funds with which 71 to purchase the equipment were acquired by him. We consider Herbert's testimony too *358 indefinite and too unsupported to warrant a conclusion that he had equipment of a value of $2,600 on hand at December 31, 1951 and December 31, 1952, and therefore have not included any such item in the net worth statement. There is a minor disagreement between the parties with respect to Herbert's investment in a diamond ring. Herbert bought a diamond ring at a cost of $3,100. He had this ring at the end of 1954. The ring was stolen in 1955 and at December 31, 1955, he had an insurance claim which had not been paid but was paid in 1956. Respondent included the $3,100 representing the diamond ring in petitioners' net worth as of December 31, 1955. Petitioners contend that the $3,100 should not be included. We agree with respondent that the claim against the insurance company as of December 31, 1955, was an asset replacing the diamond ring as an asset even though the claim was not paid until 1956. We have, therefore, included the $3,100 value of the diamond ring at December 31, 1955, in the net worth statement. The only remaining items of any substance relating to computation of petitioners' net worth with respect to which there is disagreement between the parties is the amount *359 owed by Herbert to the trust at December 31, 1955, and an issue injected by petitioners by motion to reopen filed subsequent to the trial of the case, involving a purported loan to petitioners from Marcel Boulicault. We have determined as a factual matter that Herbert was indebted to the trust at December 31, 1955, in the amount of the total $30,319.24 received from the sale of the Polo Drive property, thus disposing of this issue favorably to petitioners. The loan from Marcel Boulicault is not actually involved in this case unless petitioners' motion to reopen the case for taking of further evidence were to be granted. We reserved action on this motion until after considering this case as a whole and for reasons discussed at the end of this opinion the motion has been denied. Therefore, there is no evidence in the record to support the claimed indebtedness of petitioners to Marcel Boulicault as of December 31, 1955. We have computed petitioners' net worth as of December 31, 1951, 1952, 1953, 1954, and 1955 and the yearly increases in such net worth as shown in our findings of fact. This leaves only the question of the additions for living expenses and other non-tax-deductible expenditures *360 made by petitioners which are to be added to the net worth. Petitioners object to the additions to the yearly increases in net worth of payments made to or for Donald R. Camien and Patricia Jeanne Camien Shannon, and also to a part of the personal living expenses for the years 1954 and 1955. It is petitioners' contention that their living expenses for 1954 and 1955 were $6,000 in each year. Respondent's revenue agent testified that respondent's computation of living expenses was made from his analysis of petitioners' checks and other expenditures. Petitioners offered no evidence to show that any amount other than that determined by respondent was a proper amount of living expenses. We therefore have included living expenses in the amount determined by respondent in arriving at petitioners' gross income for each of the years in issue. Petitioners do not question that payments of the various amounts as computed by respondent were made to or on behalf of Donald and Patricia but argue that these amounts were payments to them of sums that Herbert had borrowed from the trust. The evidence shows the existence of a trust of which Herbert was trustee and Donald and Patricia were beneficiaries. *361 However, at no time prior to December 31, 1955, do petitioners' liabilities contain an indebtedness to the trust. It would therefore appear that insofar as the net worth statement is concerned respondent is correct in adding to the increases in net worth the amounts paid by Herbert to or on behalf of Patricia and Donald. Herbert explains his contention in his reply brief at page 28 with the following statement: * * * In other words, capital of the trust was used by Herbert from time to time. After January 1, 1953, he received the return of some of that capital and out of that capital he paid to the beneficiaries of the trust and also made repayments to his wife, Melita. By no stretch of the imagination could any of those payments be charged against Herbert as income, much less against Herbert and Melita jointly. If in fact Herbert had used during and prior to 1951 money from the trust, such amounts should have been set up as indebtedness of Herbert to the trust as of December 31, 1951. Such a liability would have reduced by the amount thereof petitioners' net worth as of December 31, 1951, and the increases in net worth for the years 1952 through 1955 would have been increased *362 72 by the amount of the decrease as of December 31, 1951. Had this been done, petitioners would have a valid argument that payments to Patricia and Donald not in excess of the indebtedness of Herbert to the trust, might well not constitute an addition to petitioners' increase in net worth as being nondeductible personal expenditures. The question under these circumstances would be whether in fact the payments by Herbert to Patricia and Donald were in discharge of Herbert's indebtedness to the trust or whether the indebtedness should continue as a liability of Herbert and the payments be considered as being nondeductible personal expenditures during each of the years. However, since no indebtedness of Herbert to the trust is shown as a liability of Herbert at any time prior to December 31, 1955, respondent is correct in considering Herbert's payments to Patricia and Donald as nondeductible personal expenditures of Herbert which should be added to the increases in his net worth for each year. We have set out not only the increases in net worth in our findings, but also the various items including the various payments to Donald, the $25,000 payment to Patricia in 1953, and the $1,000 *363 payment to John Shannon in 1952 which should be added to those increases along with the personal living expenses of Herbert and Melita. Since the net worth statement involved in this case is a joint statement of Herbert and Melita, it does not and properly need not list loans and repayments by one of them to the other. On the basis of the increases in net worth plus nondeductible personal expenditures of Herbert and Melita, we have arrived at the total gross income of petitioners for each of the years 1952 through 1955 and have subtracted from that amount the gross income reported on their returns to arrive at the total unreported net income for each of these years as shown in our Ultimate Facts. *
Ordinarily, we would not deem it proper to comment on a motion to reopen in an opinion. However, petitioners, in *364 their reply brief, argue with respect to the various documents attached to their motion to reopen, filed June 12, 1967, as if those documents were already in evidence. On considering the entire case, we have exercised our judgment to deny the motion to reopen and feel it proper here to comment as to the reason for such denial. The motion to reopen refers to three items which petitioners propose to offer in evidence. The motion states that one of the items is for the purpose of showing that Herbert was indebted to the trust as of December 31, 1955, in the amount of $30,319.24. We have concluded that this fact is shown by a preponderance of the evidence now of record. Therefore, there is no reason to reopen the case to take further evidence with respect to this item. Another item which petitioners state in the motion to reopen they desire to prove is the notary seal of Henry W. Hesse which was questioned at the trial in connection with respondent's evidence presented for the purpose of showing misrepresentations made by Herbert to revenue agents. The document involved purported to be a statement signed by Henry W. Hesse on September 12, 1952, on which was placed his notary seal. This *365 document stated that Hesse had done certain work for Otto Wilke and had been paid $2,600 by Herbert in July 1952, $2,000 of which amount had been returned to Herbert in payment of loans Herbert made to Hesse. We have concluded on evidence totally independent from this document that Herbert misrepresented facts to the revenue agents during the course of the investigation of his income tax returns for the taxable years 1952 through 1955, and our conclusions in this regard would be totally unaffected even if petitioners could establish that the notary seal on the document purported to have been signed by Hesse was the seal used by Hesse in July 1952. Therefore, whether or not the document petitioners propose to offer were the case reopened for further trial would establish the notary seal used by Hesse as of July 1952 was the same as the one on the document in evidence, our conclusion as to Herbert's misrepresentations to the revenue agents would be unchanged. The questioned document was not offered or received as proof of the statements contained therein but merely as going to Herbert's credibility. The final item petitioners state they could establish, were the case reopened, is that *366 they gave a note dated December 17, 1955, to a person named Marcel Boulicault in the amount of $7,000, which $7,000 was borrowed by them to make the downpayment on the house they purchased on Conway Road in St. Louis County in 1955. In view of the 73 other evidence in the record in this case, we have concluded that had Herbert testified respecting this note substantially as stated in the motion to reopen which is sworn to by Herbert under date of June 5, 1967, we would not conclude that there did exist an indebtedness from petitioners to Marcel Boulicault at December 31, 1955. We have considered the evidence now of record of deposits and withdrawals from petitioners' bank accounts at approximately the date of certain payments on the Conway Road property, and other documents in the record as it now exists in reaching this conclusion. According to the motion to reopen the note dated December 17, 1955, purportedly was to evidence the indebtedness of petitioners to Marcel Boulicault for previous borrowings at the time payments were made with respect to the purchase of the Conway Road house. At the trial Herbert explained the retention of all the receipts from the sale of the Polo *367 Drive property as being necessary because of the purchase of the Conway Road property. By December 17, 1955, Herbert had received the entire sales price of the Polo Drive property and if he had borrowed from Marcel Boulicault to make the downpayment on the Conway Road property could have repaid the loans and not given him a note. Also, documents in the record in this case indicate withdrawals from petitioners' bank accounts at approximately the date and in approximately the amounts of such payments. Our general view as to the lack of credence we place in Herbert's testimony would not be changed merely by his statements as to a note due Marcel Boulicault. Both parties, in memoranda with respect to petitioners' motion to reopen, state that Marcel Boulicault is now deceased. Since our conclusions in the case would not be changed if the motion to reopen were to be granted to receive the evidence referred to in the motion, we see no reason to further consider this motion. However, we should state that petitioners have made no showing that in the legal sense the evidence they propose to offer, were the case to be reopened, was newly discovered evidence. According to petitioners' reply *368 memorandum in support of their motion to reopen, the documents were "newly discovered in his [Herbert's] old papers." We might have denied petitioners' motion because of failure to show that the proposed evidence was unavailable at the time of the trial. However, since in considering this entire case we considered whether our conclusions would be changed were the proposed additional evidence received, we determined to state our conclusions in that regard in this opinion. Petitioners have offered no evidence to justify their failure to file declarations of estimated tax. Therefore, respondent's determination of each of the additions to tax under section 294(d)(1)(A), I.R.C. 1939, and section 6653(b), I.R.C. 1954, for the years 1952, 1953, 1954, and 1955 is sustained. Decisions will be entered under Rule 50. Footnotes
1. While Herbert did receive two notes from Tarantola in 1951 totaling $11,000, we have concluded that these notes were merely evidences of amounts due Herbert for services. Since, for this reason, the amounts represented by these notes do not represent income until paid and petitioner had given no consideration except personal services for these notes, we do not consider them properly includable as an asset in a net worth statement and petitioner does not contend to the contrary.↩
*. By official order of Tax Court dated 4/4/68, "$73,657.06" and "$26,744.07" were substituted for "$68,657.06" and "$27,177.42," respectively.↩
1. In Moore v. United States 360 F. 2d 353, 357 (C.A. 4, 1966), the Court held that a wife who was not a party to the criminal action against her husband was not estopped by the finding of fraud against her husband in the criminal case but should be permitted to litigate the question, even though she had filed a joint return wih her husband and joined with him in the civil suit for recovery of taxes and additions to taxes. In its opinion (at page 358), the Court recognized a contrary position taken by this Court in Thomas Worcester, Inc. T.C. Memo. 1965-199, affirmed in part and reversed in part without discussion of this issue, 370 F. 2d 713↩ (C.A. 1, 1966).
*. By official order of Tax Court dated 4/4/68, the words "except that for the years 1953 and 1955, the total unreported income derived from the determinations we have made in our findings exceed the amounts contended for by respondent and in those years we have limited the amount to the amount claimed by respondent" were deleted following the words "Ultimate Facts."↩